

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| GUILLERMO ACOSTA and JOSE MOLINA, | § | No. 08-24-00099-CV |
| | § | Appeal from the |
| Appellants, | § | 261st District Court |
| v. | § | of Travis County, Texas |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | § | (TC# D-1-GN-24-001726) |
| Appellees. | § | |

## **<u>SUBSTITUTED MEMORANDUM OPINION</u>**[1]

We withdraw our opinion and judgment of February 28, 2025, and substitute the following opinion and corresponding judgment in their place. Appellants' motion for rehearing is denied.

This case involves a car accident that occurred on a trip arranged through a ride-sourcing cell phone application owned and operated by Appellees Uber Technologies, Inc. and Rasier, LLC[2] (collectively, Uber). Passengers on that trip, Appellants Guillermo Acosta and Jose Molina (collectively, Riders[3]) allege they were injured when their driver, Brian Keith Inman (Driver),

---

[1] This appeal was transferred to us from the Austin Court of Appeals pursuant to a docket equalization order. Tex. Gov't Code Ann. § 73.001. We thus apply that court's precedent to the extent it conflicts with our own. Tex. R. App. P. 41.3.

[2] Rasier, LLC is Uber Technologies, Inc.'s wholly owned subsidiary. No separate basis for liability is asserted against Rasier.

[3] Acosta and Molina state that they are identically situated in terms of the legal issues raised on appeal.

collided with another vehicle. Riders asserted several direct and vicarious liability claims against Uber. Uber moved for summary judgment, which the trial court granted. For the following reasons, we affirm.

## I. BACKGROUND

### A. Factual background

Uber owns and operates the Uber App, a ride-sourcing cell phone application. The Uber App includes two components: the Rider App and the Driver App. Together, these components facilitate connections between individuals seeking a ride and individuals wishing to provide rides. Before using the Rider App, a rider must agree to Uber's Terms of Use, which specify that drivers are independent third-party providers. Before using the Driver App, a driver must agree to Uber's Technology Services Agreement, which provides that drivers are independent contractors and have no employment, agency, or joint-venture relationship with Uber.

Uber drivers have no schedules or set hours imposed by Uber, instead choosing themselves "whether, when, where, and how they wish to work." Uber drivers do not report to an Uber supervisor. There is no Uber uniform or dress code. Uber drivers determine their own routes, based on personal knowledge, input from the rider, or their choice of online navigator. Uber drivers use their own vehicles and pay all vehicle expenses, including gas, maintenance, and service. They are free to have other jobs and to use applications created by Uber's competitors, e.g., Lyft, DoorDash, and Grubhub.

On October 14, 2017, Driver was driving Riders into Austin from an outlying suburb on a trip arranged through the Uber App. Driver allegedly ran a red light and collided with another vehicle, injuring Riders.

### B. Procedural background

Riders sued Uber for the accident, maintaining it was (1) directly liable under a number of

2

theories, including distracted driving, joint venture/enterprise, nondelegable duty relating to an inherently dangerous activity, common carrier, and breach of contract/warranty; and (2) vicariously liable based on the doctrines of principal/agent, apparent authority/ostensible agency, master/servant, employer/employee, respondeat superior, nondelegable duty, and joint enterprise.[4]

Uber filed a traditional and no-evidence motion for summary judgment, contending that (1) because "[t]he evidence affirmatively establishes all requirements of Section 2402.114 of the Texas Occupation[s] Code [entitled "Transportation Network Companies"] were met, . . . [Driver] is an independent contractor as a matter of law, for whom [Uber] bear[s] no legal responsibility"; (2) Riders produced no evidence to support their claims of distracted driving, joint enterprise, joint venture, breach of contract, or gross negligence; and (3) Uber "cannot be held liable under any theory of distracted driving under Texas law."

In response, Riders argued that even if Uber met the requirements of § 2402.114, "making [Driver] an independent contractor does not mean that [Uber] is immune[.]" That is, Riders argued, "Texas has long recognized that one who hires an independent contractor may still be responsible for the [independent contractor's] torts" particularly where the hiring party "retains the control of any part of the work," citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). As to direct liability, Riders asserted "the summary judgment record raises genuine issues of material fact on how [Uber's] business model and App contribute to distracted driving, and this accident." As to vicarious liability, Riders asserted "the legislative history of Section 2402.114, if anything, shows it was enacted to insulate [Uber] and like companies from certain regulations by some cities, and not to give it blanket immunity when a[n] [Uber] driver causes an accident." Riders maintained

---

[4] Riders also sued Driver and the other vehicle's driver, Tilano Gutierrez-Aparicio. After granting summary judgment in Uber's favor, the trial court severed the claims against it into a new case, leaving Riders' claims against Driver and Gutierrez-Aparicio pending in the original case.

3

there was more than a scintilla of evidence to support two of their vicarious liability theories: ostensible agency and joint enterprise. Both parties submitted voluminous summary judgment evidence in support of their respective positions.

The trial court held a hearing on Uber's motion, at which Uber requested that Riders' latest petition and one of their summary judgment exhibits (Acosta's declaration) be struck. The trial court granted these two requests then granted summary judgment in Uber's favor.

Riders filed a motion to reconsider and an amended motion to reconsider, arguing (1) they had presented more than a scintilla of evidence to support their negligence, ostensible agency, and joint enterprise claims; (2) the trial court had erred in striking their pleading and Acosta's declaration; and (3) newly discovered evidence, namely, records from the Texas Department of Licensing and Regulation, showed that Uber was operating without a required permit at the time of the accident.

The trial court denied Riders' amended motion to reconsider and severed the claims against Uber into a new case. This appeal followed.

## II. ISSUES ON APPEAL

Riders raise two issues on appeal. First, Riders maintain the trial court erred by (a) striking their July 20, 2023, supplemental petition; (b) striking Acosta's declaration; (c) granting summary judgment on their direct negligence claim; (d) determining [Driver] was an independent contractor; and (e) granting summary judgment on their vicarious liability claims, (ostensible agency and joint enterprise). Second, Riders argue the trial court erred by denying their motion to reconsider.

## III. STANDARD OF REVIEW

We review a trial court's granting of summary judgment de novo; in doing so, "we take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d

4

614, 624 (Tex. 2018). Where a party moves for summary judgment on both no-evidence and traditional grounds, we generally address the no-evidence grounds first.[5] *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017)). "If the nonmovant fails to overcome its no-evidence burden on any claim, we need not address the traditional motion to the extent it addresses the same claim." *Id*. A defendant's no-evidence motion for summary judgment is properly granted if the plaintiff fails to produce at least a scintilla of evidence raising a genuine issue of material fact as to each challenged element of the plaintiff's claim. *Id.*

To prevail on a traditional motion for summary judgment, a defendant must conclusively negate at least one necessary element of the plaintiff's claim or establish all the elements of an affirmative defense. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). If the defendant carries this burden, the burden shifts to the plaintiff to raise a genuine issue of material fact. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018).

## IV. DISCUSSION

### A. Chapter 2402's requirements

In May 2017, four months before the accident at issue, the Texas Legislature enacted Texas Occupations Code Chapter 2402, which regulates transportation network companies. Tex. Occ. Code Ann. § 2402.003. A transportation network company (TNC) is defined as ". . . [an] entity that, for compensation, enables a passenger to prearrange with a driver, exclusively through the entity's digital network, a digitally prearranged ride[,]" excluding certain taxicab, limousine, carpool, and other specified ride services. *Id*. § 2402.001(5).

TNCs are required to obtain a permit and pay an annual fee. *Id*. §§ 2402.051, .052. They

---

[5] In this case, although the issue stems from Uber's traditional motion for summary judgment, we first address whether the trial court erred in applying Chapter 2402 to deem Driver an independent contractor, as its resolution sets the stage for our analysis of the remaining issues.

are required to convey certain information to prospective passengers (e.g., how fares are calculated and the identity of the driver and vehicle) and other information to drivers (e.g., human trafficking awareness and prevention information). *Id*. §§ 2402.103, .104, .1075. They are required to adopt intoxicating-substance and non-discrimination/accessibility policies and procedures meeting certain criteria. *Id*. §§ 2402.106, .112. They are required to confirm compliance with maximum and minimum vehicle capacity requirements. *Id*. § 2402.111.

Before permitting a driver to log in to its network, a TNC must (1) confirm that the driver is 18 years of age and has a driver's license, proof of registration, and proof of financial responsibility (liability insurance); (2) obtain a criminal background check; and (3) obtain the driver's driving record. TNCs must also prohibit a driver from using its network if the driver has been convicted of certain criminal offenses or is registered as a sex offender. *Id*. § 2402.107.

Chapter 2402 also contains vehicle occupant restrictions, allowing "shared rides" by multiple passengers if the passengers consent, *id*. § 2402.102, but disallowing riders who have not been "matched to the driver through the [TNC's] digital network," *id*. § 2402.108.

In addition to imposing these and other requirements, Chapter 2402 provides that a driver authorized to use a TNC's network "is considered an independent contractor for all purposes, and not an employee of the company" if: (1) the TNC does not (a) prescribe the driver's work hours, (b) restrict the driver's use of other TNC networks, (c) limit the driver's territory, or (d) restrict the driver from other employment; and (2) the TNC and driver agree in writing that the latter is an independent contractor. *Id*. § 2402.114.

**B. Chapter 2402's applicability**

We begin with sub-issue (d) of Riders' first issue—whether "the trial court err[ed] in . . . [a]pplying Chapter 2402 to deem [Driver] an independent contractor"—as the answer to this question will affect how we analyze other issues.

6

Riders acknowledge that a TNC driver is deemed an independent contractor under § 2402.114 if certain conditions are met,[6] and they do not dispute that such conditions were met here. Instead, Riders contend "those conditions don't matter if [Uber] d[id] not hold a permit to operate as a TNC" on the day in question. To show that Uber lacked such a permit, Riders cite: (1) records from the Texas Department of Licensing and Regulation (TDLR), which reflect that Uber held no such permit on October 14, 2017, the date of the accident; and (2) 42 Tex. Reg. 6615, which indicates that TDLR's regulations for issuing TNC permits were not effective until December 1, 2017, thus "it was impossible for Uber to hold a TNC permit under Chapter 2402 at the time of the accident."[7]

Because Uber was operating without a permit on the day in question, Riders argue, it cannot claim "benefits" or "immunity" under Chapter 2402. That is, "[g]enerally, operating a transportation company without a proper license or permit is illegal, and courts will not enforce illegal contracts." In support of their argument, Riders cite *Peniche v. Aeromexico*, 580 S.W.2d 152, 155 (Tex. App.—Houston [1st Dist.] 1979, no writ), which involved a driver-for-hire operating without a chauffeur license, and *Ben E. Keith Co. v. Lisle Todd Leasing, Inc.*, 734 S.W.2d

---

[6] Section 2402.114 provides that:

A driver who is authorized to log in to a transportation network company's digital network is considered an independent contractor for all purposes, and not an employee of the company in any manner, if:

(1) the company does not:

    (A) prescribe the specific hours during which the driver is required to be logged in to the company's digital network;

    (B) impose restrictions on the driver's ability to use other transportation network companies' digital networks;

    (C) limit the territory within which the driver may provide digitally prearranged rides; or

    (D) restrict the driver from engaging in another occupation or business; and

(2) the company and the driver agree in writing that the driver is an independent contractor.

[7] *See* 42 Tex. Reg. 6615, 6616, 6621 (2017) (to be codified at 16 Tex. Admin. Code, ch. 95) (Tex. Dep't of Licensing & Regulation, TNCs) (adopting new rules, effective December 1, 2017, including 16 Tex. Admin. Code § 95.20, which requires TNCs to obtain a permit); *see also* 42 Tex. Reg. 4742, 4743 (2017) (Tex. Dep't of Licensing & Regulation) (proposing text for new rules, including 16 Tex. Admin. Code § 95.20).

7

725, 727 (Tex. App.—Dallas 1987, writ ref'd n.r.e.), which involved a common carrier operating without a contract carrier permit. In both cases, the party operating without a permit was held to be doing so illegally and thus unable to enforce contract terms relating to such operations. *Peniche*, 580 S.W.2d at 155; *Keith*, 734 S.W.2d at 727.[8]

Uber does not try to distinguish cases like *Peniche* and *Keith*; instead, it approaches the issue from a different angle, citing *Freyer v. Lyft, Inc.*, 639 S.W.3d 772, 780 (Tex. App.—Dallas 2021, no pet.). *Freyer* involved a car accident that occurred on a trip arranged by Lyft, one of Uber's competitors. *Id.* at 778. There, the injured passenger argued the Lyft driver "was not an independent contractor pursuant to [Chapter 2402] because [the driver] did not satisfy a statutory requirement" (i.e., he "did not have liability insurance at the time of the accident"); "therefore, [the passenger's] respondeat superior claim against Lyft should not be barred." *Id.* at 780. The Dallas Court of Appeals rejected this argument, holding that "the plain language of [§] 2402.114 for independent contractors does not incorporate a liability insurance requirement or a cross-reference to [§] 2402.107[,]" which contains the relevant driver insurance requirement. *Id.* at 781. Similarly, Uber argues, § 2402.114 does not incorporate or cross-reference the statute's permitting requirements.

Riders maintain *Freyer*'s logic is inapplicable here, urging us to hold that "a company like Uber does not get the statutory protections afforded to licensed TNCs where it chooses not to obtain the necessary license(s) and operates illegally." We disagree with Riders that Uber "chose not to comply with [Chapter 2402's] licensing requirements" during the relevant interval. First,

---

[8] As Riders note, cases with similar holdings include *Turner v. Gossett*, 267 S.W.2d 877, 879 (Tex. App.—San Antonio 1954, no writ) ("[The plaintiff] violated the law in hauling material for another . . . without first having secured a certificate of convenience and necessity, and is not now in a position to enforce payment for such hauling in a court of law[.]"). However, among other things, unlike in *Peniche*, *Keith*, and *Turner*, *see* 580 S.W.2d at 155; 734 S.W.2d at 727; 267 S.W.2d at 879, here it was impossible for Uber to obtain a permit during the relevant interval, as discussed below.

while Chapter 2402 became effective on May 29, 2017, the TDLR did not begin issuing TNC permits until December 1, 2017. Second, while Section 2 of the legislation creating Chapter 2402 provided that in the interim a TNC could operate anywhere in the state under a municipal permit obtained before the legislation's effective date, Section 2 provided no avenue to obtain such a permit for a TNC not already in possession of one.[9] Moreover, Section 3 of the legislation voided all municipal TNC ordinances.[10] Uber, not having already obtained a municipal permit by May 29, 2017, had no way to obtain a TNC permit from any source between that date and the date of the accident, October 14, 2017. Thus, it cannot be said that Uber "*chose* not to comply with [Chapter 2402's] licensing requirements" during the relevant interval (emphasis added). Instead, it was impossible for Uber to do so. We decline to construe Chapter 2402 to impose an impossible condition. Courts "should not read a statute to create such an absurd result" and "[a] too literal construction of a statute, which would prevent the enforcement of it according to its true intent, should be avoided." *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 629 (Tex. 1996) (reasoning that where the Edwards Aquifer Act had not yet taken effect due to unforeseen delays, a deadline imposed by the Act itself which had already passed was not

---

[9] Section 2 of the legislation provided as follows:

SECTION 2. A [TNC] operating under a municipal ordinance in a municipality of this state immediately before the effective date of this Act may operate at any location in this state without the permit required under Section 2402.051, Occupations Code, as added by this Act, until the later of:

    (1) the 30th day after the date rules adopted by the [TDLR] to administer Section 2402.051 become effective; or

    (2) the date the company's application for a permit under Section 2402.051 submitted to the [TDLR] before the date described by Subdivision (1) of this section is approved or denied.

Act of May 17, 2017, 85th Leg., R.S., ch. 231, 2017 Tex. Gen. Laws 440.

[10] Section 3 of the legislation provided as follows:

SECTION 3. On the effective date of this Act, any municipality's or other local entity's ordinance or policy related to [TNCs] or drivers authorized to access [TNCs'] digital networks is void and has no effect.

Act of May 17, 2017, 85th Leg., R.S., ch. 231, 2017 Tex. Gen. Laws 440.

intended to create an impossible condition).[11]

Uber's purported choice not to obtain a TNC permit is the sole reason Riders assert that *Freyer*'s reasoning does not apply here. That is, Riders offer no other objection to Uber's argument that under *Freyer*'s logic, Chapter 2402's independent contractor provision is no more connected to its permit requirement than to its driver insurance requirement. As noted above, Riders do not dispute that all requirements under Chapter 2402's independent contractor provision were met here. We conclude that Riders have not shown the trial court erred in determining Driver was an independent contractor on the day in question.

Accordingly, we overrule sub-issue (d) of Riders' first issue.

## C. Direct liability

We next turn to sub-issue (c) of Riders' first issue—that the trial court erred in granting summary judgment on the direct negligence claims.

### (1) Exercise of control

As Riders point out, "the central premise of Uber's traditional motion for summary judgment was that Uber is a TNC under Chapter 2402, and as such, its [Driver] was an independent contractor," thereby insulating Uber from liability. As Riders further correctly note, the independent contractor doctrine is not absolute; one who hires an independent contractor but retains control may lose the benefit of the doctrine:

> The general rule is that an owner or occupier does not have a duty to see that an

---

[11] Notably, Section 4 of the legislation creating Chapter 2402 provided that it would become effective immediately if it received a vote of two-thirds in each house, otherwise it would become effective on September 1, 2017. Act of May 17, 2017, 85th Leg., R.S., ch. 231, 2017 Tex. Gen. Laws 440. Because the legislation passed by a two-thirds vote in both houses, it became effective immediately upon its approval on May 29, 2017, *id.*, thereby making it impossible to obtain a municipal permit between the statute's enactment date and its effective date (which coincided on May 29, 2017). In contrast, had the legislation passed by less than a two-thirds vote in either house, there would have been a three-month interval between the statute's enactment date and its effective date, during which a municipal permit could have been obtained by a TNC not already in possession of one. These facts suggest a lack of true intent by the Legislature to make it impossible for a TNC to obtain a municipal permit after the statute's enactment date but before its effective date.

independent contractor performs work in a safe manner.

.　　　.　　　.

However, when the [owner] exercises some control over [the independent contractor's] work he may be liable unless he exercises reasonable care in supervising the [independent contractor's] activity.

*Redinger*, 689 S.W.2d at 418 (citing RESTATEMENT (SECOND) OF TORTS: NEGLIGENCE IN EXERCISING CONTROL RETAINED BY EMPLOYER § 414 (Am. L. Inst. 1965)). Whether Uber may be directly liable for Driver's conduct thus depends on whether it retained control over relevant aspects of his work. *See Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998) (per curiam) (requiring "*nexus* between . . . retained supervisory control and the condition or activity that caused the injury") (emphasis in original); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 294 (Tex. 2004) (holding it is not enough to show hiring party controlled some activities of independent contract if ones controlled had nothing to do with harm that ultimately occurred).

Riders maintain Uber "exercises significant control over its drivers," and "[a]mong the many ways it does so, the most notable here is how [d]rivers *must have the App turned on at all times* and how [d]rivers *must respond to the App while they are driving*," thereby leading to distracted driving (emphasis added).[12] In support of the contention that Uber "require[s] Drivers to interact with their phones while driving," Riders cite: (1) testimony by Uber's corporate representative, Brad Rosenthal, that a driver using the Uber App "might be presented an offer [for

---

[12] In a "preliminary statement" in their brief, Riders similarly assert, "Uber is directly liable for its own negligence in proximately causing the accident—its business policies and *the App it designed and requires all Drivers to keep on at all times* distracted [Driver]" (emphasis added). Riders underscore the point again in their reply:

This case presents a classic example of when liability can attach to an entity that purports to rely on independent contractors to carry out its business when that entity retains control over the part of the independent contractor's performance that led to the underlying injury.

.　　　.　　　.

That is precisely what Uber did here. *Uber required* [*Driver*] *to use the Uber* [*A*]*pp, while driving, in ways that distracted attention* from his job of safely driving customers where they want to go (emphasis added).

a new trip] while that driver is completing a prior . . . trip"; and (2) the Uber driver agreement, which requires that a driver's geolocation information be transmitted to Uber for the driver to provide rides arranged on the Uber App.

Uber, in contrast, contends there is no evidence that it *required* Driver to have the Driver App displayed while he was driving. For example, Rosenthal clarified that while it was possible for drivers to be offered new trips while driving, they can also "opt out in receiving further or additional offers if they would like." When asked, "assuming that the driver is working and trying to make money using the Uber application, would the Uber [A]pp . . . be running while the vehicle is in motion," Rosenthal answered that the driver "doesn't have to have the app running, no, and the app could be in the background," or the driver "could . . . hit the close button on all [his] apps, so it's just a black screen." Rosenthal further testified that it is "up to the driver" whether to have the sound on.[13]

In short, the evidence before us indicates that Uber does not *require* drivers to interact with their phones while driving, although its software *allows* such interaction.[14] Under Texas law,

---

[13] Noting that Rosenthal said he "believe[d]" certain things to be true, Riders argue in their motion for rehearing that "[b]eliefs are not evidence," and in their reply in support thereof cite *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) for the proposition that "[a]n interested witness' affidavit which recites that the affiant 'estimates,' or 'believes' certain facts to be true will not support summary judgment." However, in its response Uber cites the Fourteenth Court of Appeals' opinion in *Huckin v. Connor*, 928 S.W.2d 180, 184 (Tex. App.—Houston [14th Dist.] 1996, writ denied), which clarifies that "[w]here it appears that a witness is testifying to facts from his own observation but that his observation was uncertain, or his recollection is unclear[,] he may qualify his testimony by the use of such phrases as "I believe," "I think," "It is my impression," without detracting from its admissibility." *See also K.J. v. USA Water Polo, Inc.*, 383 S.W.3d 593, 607 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("Merely stating a 'belief' or 'I believe' does not make an affidavit insufficient if other evidence demonstrates the affiant's personal knowledge."). Riders do not contend that Rosenthal lacked personal knowledge of the subject matter at issue.

[14] In their motion for rehearing, Riders concede that "[i]t's true that an Uber driver *could* choose to turn the Uber app off, and it may be true that an Uber driver can have the app 'in the background' (whatever that means)," but argue this "doesn't mean an Uber driver *who is trying to obtain work using the Uber app* can turn the app off (or have it 'in the background')." (emphasis in original). Further, Riders contend, "[g]iven that offer cards are the sole mechanism for Uber drivers to connect to riders, and that Uber drivers must have the Uber app active at all times while driving for Uber, it defies logic that drivers could 'disable' the 'feature' by which they receive offer cards, any more than they can turn the Uber app off entirely while driving for Uber." However, Riders do not account for the possibility that a driver might choose to drive passengers to their destinations with the Uber app in a non-distracting mode (e.g., in the background, without sound), then, while safely parked somewhere between rides, "try to obtain work using the Uber

12

exercising control over an independent contractor necessarily entails imposing requirements, not merely offering suggestions or options. *See Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015) ("[A hiring party's] mak[ing of] suggestions or recommendations which need not necessarily be followed . . . does not mean that the [independent] contractor is controlled as to his methods of work, or as to operative detail"; "There must be such a retention of a right of supervision that the [independent] contractor is not entirely free to do the work in his own way.") (quoting RESTATEMENT (SECOND) OF TORTS: NEGLIGENCE IN EXERCISING CONTROL RETAINED BY EMPLOYER § 414 cmt. c (Am. L. Inst. 1965)); *id.* at 507 (independent contractor's obeying of hiring party's suggestions not evidence of control); *Shell Oil*, 138 S.W.3d at 294 ("We have held repeatedly . . . that merely making recommendations is no evidence of a right to control."). Accordingly, because there is no evidence that Uber required rather than merely allowed drivers to interact with its App while driving,[15] Riders have not shown that the trial court erred in denying their direct liability claim against Uber. But even if Riders had adduced more than a scintilla of evidence on this point, their direct liability claim faced another obstacle to overcoming summary judgment: lack of a recognized cause of action, which we turn to next.

### (2) Existence of distracted driving cause of action against TNCs

Uber argues that because neither the Texas Legislature nor the Texas Supreme Court has recognized a cause of action for distracted driving caused by a cell phone application, the trial court was correct to reject such a novel claim and we should do so as well. In support of its position,

---

app" in an active mode (e.g., in the foreground, with sound).

[15] In a footnote, Riders contend Uber "encourages its drivers to engage in conversation with customers and rewards them with 'badges' that they can display, including 'great conversationalist,'" thereby "incentivizing" Driver to converse with Riders when he should have focused on the road. We conclude that this aspect of the Uber App, like the others discussed above, entails the offering of options and suggestions rather than imposing of any requirement that might give rise to liability. *See Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015) (making of suggestions and recommendations to independent contractor does not give rise to liability).

13

Uber cites the Austin Court of Appeals' opinions in *Anderson v. Archer*, 490 S.W.3d 175, 177 (Tex. App.—Austin 2016), *aff'd*, 556 S.W.3d 228 (Tex. 2018) ("Absent legislative or supreme court recognition of the existence of a cause of action, we, as an intermediate appellate court, will not be the first to do so.") and *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.) ("As an intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court unless and until the high court overrules them or the Texas Legislature supersedes them by statute.").

In response, citing three Texas disruptive-passenger cases, Riders maintain their direct negligence claim is "grounded both in precedent and in longstanding and fundamental tort concepts of foreseeability and causation." *See Choctaw Nation of Okla. v. Sewell*, No. 05-16-01011-CV, 2018 WL 2410550, at *4 (Tex. App.—Dallas May 29, 2018, pet. dism'd) (mem. op.); *Escamilla v. Garcia*, 653 S.W.2d 58, 61–62 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.); and *Adams v. Morris*, 584 S.W.2d 712, 716 (Tex. App.—Tyler 1979, no writ).

However, each of these cases involved a passenger who engaged in disruptive conduct that distracted the driver immediately before the accident. *See Choctaw Nation*, 2018 WL 2410550, at *4 (passenger argued with bus driver about route to follow); *Escamilla*, 653 S.W.2d at 61–62 (passenger yelled and grabbed at driver or steering wheel); *Adams*, 584 S.W.2d at 716 (passenger asked driver to clean up seat while passenger attempted to stand up in moving car).

Here, in contrast, Riders do not contend Uber did anything to distract Driver immediately before he allegedly ran the red light. To the contrary, Riders concede that the most recent communications between Uber and Driver had occurred at earlier points in time: "[Uber] sent [Driver] a text message at 2:14 pm (about 1 hour and 21 minutes before the accident) alerting him to the end of a music fest where persons would need rides," and "[a]bout fourteen minutes before

14

the accident, Uber sent another text encouraging him to go to Zilker Park."[16]  Riders also mention communication soon after the crash: "within minutes of estimated time of the crash, [Driver] received two offer cards [for prospective trips]."

To establish causation despite the gap in time, Riders proffered cognitive psychologist Dr. Paul Atchley's expert opinion that "[w]hen a phone is present in a vehicle, users are compelled to use them, sometimes doing so without awareness, and when they do their ability to perceive the level of driving risk declines." In Atchley's opinion, cell phone users have a "compulsion" that is "driven by automatic behavior patterns of checking the phone." With regard to Uber drivers, Atchley testified that Uber "promoted" such a compulsion:

> Uber . . . promotes driver attention to their phone while driving. The Uber [A]pp alerts [D]rivers to possible rides, even while that [D]river is driving another passenger. Uber [D]rivers must attend to, read and respond to a possible ride within twenty seconds, creating a strong incentive for drivers to monitor their phone.

As a result, Atchley opined, "it [is] more likely than not that inattention on the part of [Driver] was a result of the design of the Uber [A]pp."[17]

In *Meador v. Apple, Inc.*, 911 F.3d 260 (5th Cir. 2018), the United States Fifth Circuit Court of Appeals analyzed a distracted driving claim brought against Apple, Inc. based on a similar

---

[16] While Acosta stated in his declaration that Driver was "constantly looking at the displayed app on his phone" while driving, Acosta does not state that he himself could see the displayed app, nor does he identify the displayed app as the Uber App as opposed to a navigation app or other app or series of apps.

[17] Riders neither pleaded a design defect claim nor argue the elements of such a claim can be met here, thus we do not consider such a claim. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009) ("To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the [alleged] injury . . . ."; "To determine whether a product was defectively designed . . . , Texas courts have long applied a risk-utility analysis that requires consideration of [several factors]," including: "(1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer"); *see also Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 437 (Tex. 1997) ("negligent design" claim is likewise "predicated on the existence of a safer alternative design").

"compulsion" theory. There, the plaintiffs asserted "receipt of a text message triggers in the recipient 'an unconscious and automatic, neurobiological compulsion to engage in texting behavior.'" *Id.* at 263. Faced with the question of whether such a compulsion can be a cause-in-fact of a car accident under Texas law, the Fifth Circuit decided that "answering in the affirmative would entail an impermissible innovation or extension of state law." *Id.*; *see also id.* at 264 (in applying substantive state law under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), "[i]f guidance from state cases is lacking, 'it is not for [federal courts] to adopt innovative theories of recovery'").

As to whether a useful analogy was provided by disruptive-passenger cases like *Choctaw v. Sewell*, the Fifth Circuit stated, "[n]one of the causes [of action] alleged in [such] cases strains the sensibilities of a reasonable person, nor does any resemble the [compulsion-based] cause [of action] advanced . . . here." *Id*. at 266 n.5.

Furthermore, as to whether a useful analogy was provided by the Texas Supreme Court's adoption of dram shop liability in *El Chico Corp. v. Poole*, 732 S.W.2d 306, 310 (Tex. 1987) *superseded by statute*, Tex. Alco. Bev. Code Ann. § 2.02 *as recognized in F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680 (Tex. 2007)—an analogy advocated by Riders—the Fifth Circuit had this to say:

> The recognition of dram shop liability in Texas came about in a noteworthy way. The common law did not make an alcohol seller liable for harms caused by intoxicated patrons, but, noting developments in other states, the Texas Supreme Court saw it as its duty "to recognize the evolution" in the law. It held that "an alcoholic beverage licensee owes a duty to the general public not to serve alcoholic beverages to a person when the licensee knows or should know the patron is intoxicated." Concurrently, the Texas Legislature passed the Dram Shop Act, which created a cause of action with different contours. In the years that followed, a productive exchange between judicial and legislative branches unfolded, gradually resolving various further questions, large and small. The result was a comprehensive regulatory scheme reflecting the two branches' extensive deliberations and considered judgments.

16

.  .  .

> To the extent there is a meritorious analogy between smartphone manufacturers and dram shops, it is for the state to explore, not us.
>
> With the state not yet speaking directly to this issue, we note that the debilitating effects of alcohol have been recognized much longer than the effects of smartphones, and the proper regulation of the former has been debated much longer than the latter. Moreover, the law development that has occurred places the onus of distracted driving on the driver alone.

*Meador*, 911 F.3d at 266–67 (citations omitted).

Like the Fifth Circuit, state intermediate appellate courts are not the proper forum to recognize new causes of action. *See Anderson*, 490 S.W.3d at 177; *Petco*, 144 S.W.3d at 565; *see also Burgess v. El Paso Cancer Treatment Ctr.*, 881 S.W.2d 552, 556 (Tex. App.—El Paso 1994, writ denied) ("[C]hanges in the common law should be left to the Texas Legislature and our Supreme Court."). We agree with the Fifth Circuit that a distracted driving claim based on compulsion to use a cell phone has not been recognized by the Texas Legislature or the Texas Supreme Court. Accordingly, we decline Riders' invitation to create such a claim in this case.[18]

Because the trial court did not err in granting summary judgment on Riders' direct negligence claim, we overrule sub-issue (c) of their first issue.

### D. Vicarious liability

Turning to sub-issue (e) of their first issue, Riders contend the trial court erred in granting summary judgment on two of their vicarious liability claims: ostensible agency and joint enterprise. We discuss each in turn.

---

[18] Even if this Court were the proper forum to recognize a new cause of action, we could not engage in the relevant analysis based on the briefing before us, as it does not discuss the relevant factors to be considered. *See Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 145 (Tex. 2022) ("To determine whether a duty exists and what its parameters are, we apply what are commonly called the '*Phillip*s factors,'" (taken from *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)); "This inquiry requires us to 'weigh[] the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.' In making this assessment, we also consider 'whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm.'").

### (1) Ostensible agency

Riders argue "[a]n ostensible agency claim is not defeated by a showing that the tortfeasor is an independent contractor," citing *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998). In *Sampson*, the Texas Supreme Court held that a party who hires an independent contractor is generally not vicariously liable for its conduct, but may act in a way that makes it liable under the doctrine of ostensible agency. *Id*. at 947, 949. Ostensible agency has the following elements: (1) the plaintiff "had a reasonable belief that the [independent contractor] was the agent or employee of the [hiring entity]"; (2) "such belief was generated by the [hiring entity] affirmatively holding out the [independent contractor] as its agent or employee or knowingly permitting the [independent contractor] to hold herself out as the [hiring entity's] agent or employee"; and (3) "[the plaintiff] justifiably relied on the representation of authority." *Id*.

The facts and holding in *Sampson* are instructive. There, the plaintiff, a hospital patient who claimed the doctors working at the hospital were its ostensible agents, signed a consent form "explaining that all physicians at the [h]ospital are independent contractors who exercise their own professional judgment[.]" *Id*. at 950. In an effort to raise a fact issue, the plaintiff cited evidence that although "directed . . . to sign several pieces of paper before she was examined," she "did not read them and no one explained their contents to her"; she "did not recall signing the documents"; she "did not . . . see any signs stating that the doctors who work in the emergency room are not [hospital] employees"; and she "did not choose which doctor would treat her and . . . believed that a physician employed by the hospital was treating her." *Id*. Based on this evidence, the court concluded that the hospital "took no affirmative act to make actual or prospective patients think the emergency room physicians were its agents or employees," thus the plaintiff failed to raise a fact issue on the affirmative-holding-out element of her ostensible agency claim. *Id*.

Here, Riders acknowledge the existence of the Uber rider agreement in effect on the day

of the accident, which states that "[Uber] [s]ervices may be used by you to request and schedule transportation . . . services with third party providers, but you agree that Uber has no responsibility or liability to you related to any transportation . . . services provided to you by third party providers other than as expressly set forth in these terms" (all-caps in original). While Riders' brief is silent as to whether they read or understood the agreement,[19] they do—similarly to the plaintiff in *Sampson*—claim (1) not to recall seeing any signs in Driver's vehicle stating Driver was an independent contractor; and (2) not to have chosen which driver would transport them ([Riders] "did not seek a ride from [*Driver*]—[but rather] contacted *Uber* for [a] ride") (emphasis in original).[20] We conclude, as did the court in *Sampson*, that such assertions do not raise a fact issue on the affirmative-holding-out element of an ostensible agency claim. *See* 969 S.W.2d at 950.

Relying on three further factors identified in our unpublished opinion in *Moreno v. Columbia Med. Ctr.-E.*, No. 08-00-00040-CV, 2001 WL 522432, at *2 (Tex. App.—El Paso May 17, 2001, pet. denied)[21] —"separate billing," "control," and "general circumstances,

---

[19] Rather than focus on what they did or did not read or understand, Riders take a more abstract approach to challenging the rider agreement, arguing it "would not prompt a User like Riders to believe Uber drivers like [Driver] are always independent contractors, and it clearly suggests that at least some Uber drivers are not." "Thus, when [Driver] described himself as an Uber Driver to [Riders], there was no reason for [Riders] to think [Driver] was actually an independent contractor." However, to prevail on an ostensible agency claim, Riders must show Uber affirmatively held Driver out as its agent, not that the rider agreement or Driver's conduct created ambiguity as to Driver's status. *See Sampson*, 969 S.W.2d at 950 (ostensible agency requires an "affirmative act" by the hiring party to make a third party think the independent contractor was the hiring party's agent); *see also Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007) (in an ostensible agency claim, "only the conduct of the principal is relevant"). Further, the specific language in the rider agreement which, according to Riders, "clearly suggests" that at least some Uber drivers are not independent contractors, is the following: "You . . . acknowledge that [Uber's] [s]ervices may be made available under [any of Uber's various brands] by or in connection with: (i) certain of Uber's subsidiaries and affiliates; *or* (ii) independent Third Party Providers, including [TNC] drivers, Transportation Charter Permit holders or holders of similar transportation permits, authorizations or licenses" (emphasis added by Riders). We do not believe this language is susceptible to Riders' reading that it clearly suggests certain of Uber's subsidiaries and affiliates are Uber drivers.

[20] Riders characterize this last contention as involving "whether the plaintiff sought a specific provider or engaged the principal because of its reputation," but cites no evidence that they engaged Uber because of its reputation.

[21] Notably, while we concluded in *Moreno* that a fact issue existed on the affirmative-holding-out element of an ostensible agency claim in the hospital/doctor context, we did so based on evidence that the doctor treated the plaintiff while wearing a smock or lab coat with the hospital's insignia on the front. *See* 2001 WL 522432, at *4. Here, in contrast, Riders do not allege Driver was wearing an Uber uniform or other branded clothing, and Uber's driver agreement expressly states that "[Uber] shall have no right to require you to: (a) display [its or its affiliates'] names,

19

appearance, and reliance"[22]—Riders cite additional evidence which they contend raised a fact issue on the affirmative-holding-out element.

As to separate billing, Riders contend "Uber bills the User and it then splits the money with the Driver via a formula unknown to the User[,]" and here "the 'receipt' . . . came from Uber." However, such an arrangement is not inconsistent with a non-agency relationship, and the rider agreement's billing language indicates Uber drivers are in fact separate from Uber. Examples of such language include "Uber may use the proceeds of any Charges for any purpose, subject to any payment obligations it has agreed to with any Third Party Providers"; "In certain cases, with respect to Third Party Providers, Charges you incur will be owed directly to Third Party Providers, and Uber will collect payment . . . from you, on the Third Party's behalf as their limited payment collection agent"; and "In all other cases, Charges you incur will be owed and paid directly to Uber or its affiliates, where Uber is solely liable for any obligation to Third Party Providers."

As to control, Riders contend Uber "exercises significant control over the entire ride process as detailed above," but they do not explain which particular aspect or aspects of such "control" might bear on whether Uber affirmatively holds its drivers out as its agents.[23]

Finally, as to "general circumstances, appearance, and reliance," Riders contend they "filed an accident report *through the Uber App*" (emphasis in original), but do not explain how or why this might bear on whether Uber affirmatively held Driver out as its agent.

Considering all the evidence in the light most favorable to Riders, we conclude that they

---

logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying [its or its affiliates'] names, logos or colors."

[22] These factors have neither been adopted by the Texas Supreme Court nor cited in a published opinion by this Court. Nor has the relevance of these factors in other contexts been assessed. We need not, and do not, decide such matters here.

[23] In addition, in part IV.C, we conclude that Riders' "control" argument lacks support in the evidentiary record before us.

have cited no more than a scintilla of evidence to support the affirmative-holding-out element of their ostensible agency claim.

### (2) Joint enterprise

Uber maintains that Driver's independent contractor status precludes the existence of a joint enterprise between Driver and Uber, citing *Walker v. Messerschmitt Bolkow Blohm GmBH*, 844 F.2d 237, 243 (5th Cir. 1988) ("the principal/independent contractor relationship is fundamentally incompatible with a joint enterprise") and *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 58 S.W.3d 263, 276 (Tex. App.—Fort Worth 2001, pet. denied) ("[T]he summary judgment evidence provided conclusively disproves any community of pecuniary interest [which is required for a joint enterprise], as it supports an independent contractor relationship.").

Riders counter that *Walker* and *Blackburn* are irrelevant; because they involved independent contractor status under the common law, they do not apply here, at least not to the extent Uber relies on Chapter 2402's independent contractor provision. Riders reason as follows:

> [Driver] is an "independent contractor" only in the sense that the Legislature set out four special criteria for TNCs which Uber contends it meets. The four criteria that statutorily define an independent contractor are not the same criteria that courts have used for years to distinguish independent contractors. The rationale from *Walker*, built on a common law determination of independent contractor status, does not apply to an independent contractor label based on the four statutory requirements.

In other words, according to Riders, Chapter 2402's independent contractor provision "omits many of the key elements of a common law determination of independent contractor status"; "*Walker* and cases like it thus cannot be unrooted from their decisional underpinnings and applied to this unique statutorily based situation."

However, as Uber points out, the statutory provision at issue provides that if certain conditions are met, "[a] driver who is authorized to log in to a [TNC's] digital network is

21

considered an independent contractor *for all purposes*." Tex. Occ. Code Ann. § 2402.114 (emphasis added). Riders do not dispute that Uber met the relevant conditions or that Driver was authorized to log onto its network. Further, crucially, Riders identify no reason why "for all purposes" would not include the purpose at issue here, i.e., determining whether Uber and its drivers are engaged in a joint enterprise.[24] Accordingly, we conclude that Driver's independent contractor status under § 2402.114 precludes Riders' joint enterprise claim.

Because the trial court did not err in granting summary judgment on Riders' vicarious liability claims, we overrule sub-issue (e) of Riders' first issue.

## V. CONCLUSION

For the reasons stated above, we conclude: (1) the trial court did not err in determining that Driver was an independent contractor or in granting summary judgment on Riders' direct liability claim (distracted driving) and vicarious liability claims (ostensible agency and joint enterprise); and (2) we need not decide Riders' second issue as well as sub-issues (a) and (b) of their first issue, i.e., whether the trial court erred in striking Riders' July 20, 2023 supplemental petition, striking Acosta's affiant declaration, or denying their motion to reconsider, as we have considered all of the allegations, evidence, and arguments briefed by Riders in relation to these filings.

Accordingly, we affirm the judgment of the trial court.

LISA J. SOTO, Justice

July 1, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

---

[24] To the extent Riders invite us to craft an exception to § 2402.114, we are not at liberty to do so. *See Odyssey 2020 Acad., Inc. v. Galveston Cent. Appraisal Dist.*, 624 S.W.3d 535, 543 (Tex. 2021) ("A court may not judicially amend a statute by adding words that are not contained in the language of the statute.") (citing *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015)); *id.* ("[T]he statute applies 'for all purposes.' We cannot add a proviso 'except for tax purposes.'").